## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

MATTHEW A. SHEPARD,                    :

     Plaintiff,                    :
                                     Case No. 3:12cv00149

vs.                    :

                               District Judge Thomas M. Rose

CAROLYN W. COLVIN,                    :   Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,                    :

     Defendant.                    :

## REPORT AND RECOMMENDATIONS[1]

## I.  INTRODUCTION

Plaintiff Matthew A. Shepard sought financial assistance from the Social Security Administration by applying for Disability Insurance Benefits ("DIB") in September 2007, alleging disability since December 2, 2006.  (*PageID## 174-76*).  He claims disability from chronic back pain caused by bulging and deteriorated discs; arthritis in back due to deteriorated discs; an anxiety disorder; arthritis in his left wrist; and migraine headaches. (*PageID# 212*).

After various administrative proceedings, Administrative Law Judge ("ALJ") Peter B. Silvain denied Plaintiff's DIB application based on his conclusion that Plaintiff's

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

1

impairments did not constitute a "disability" within the meaning of the Social Security

Act.  (*PageID##* 43-59).  The ALJ's nondisability determination and the resulting denial

of benefits later became the final decision of the Social Security Administration.  Such

final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff is

now due.

 This case is before the Court upon Plaintiff's Amended Statement of Errors (Doc.

#8), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc.

# 11), the administrative record (Doc. # 5), and the record as a whole.

 Plaintiff seeks, at a minimum, remand for a new hearing so that the ALJ can

make new findings, with the proper inclusion of evidence generated by the State's

reviewing physicians, on Plaintiff's individual psychological impairments.  The

Commissioner seeks an Order affirming the ALJ's decision.

## II. BACKGROUND

###  A. <u>Plaintiff's Vocational Profile and Testimony</u>

 Plaintiff was 38 years old on his alleged onset date of disability and is thus

considered to be a "younger person" for purposes of resolving his DIB claim.  *See* 20

C.F.R. § 404.1563(c); *see also PageID##* 57, 207.  Plaintiff has a high school education,

and has previous work experience as an auto and truck detailer; vehicle assembler in a

factory; and press operator in a box factory.  (*PageID##* 213, 225, 227-37).

 Plaintiff testified before the ALJ that he resides in a house with his wife and two

teenage children.  (*PageID##* 73-74).  He only drives a car occasionally.  (*PageID#* 74).

He lives in a small town of only 300 people.  (*PageID#* 99).  Plaintiff indicated that he could read and write but his wife takes care of the checkbook and the bills.  (*PageID##* 75-76).

Plaintiff last worked in 2006 when he was let go by his employer because of excessive absences.  He missed work due to back problems and migraine headaches. (*PageID#* 82).

At the time of the ALJ's hearing, Plaintiff was receiving treatment for anxiety and back pain.  (*PageID#* 83).  Plaintiff testified that he stopped seeing a therapist and a psychiatrist because of their expense.  (*PageID#* 84).  Plaintiff testified that anxiety started becoming very bad for him in 1998.  (*PageID#* 86).  A number of difficulties brought on his anxiety.  (*Id.*).  Plaintiff testified, "if I am away from home I'll have panic attacks.  I deal with the anxiety on a daily basis.  That's just – I have trouble like going to the family get-togethers.  I'll stay home, because that's my comfort zone, and I have trouble engaging in conversation with my own family."  (*PageID##* 86-87).  Plaintiff indicated that he has these feelings "just about all of the time."  (*PageID#* 87).

Plaintiff further testified that "I just feel worthless, don't, no energy.  I don't feel like getting up and doing anything.  There are days I don't want to get out of bed.  Just since all this has come on me, I just don't really feel like a man, I guess.  I don't know." (*PageID#* 87).  Plaintiff indicated medications do not help with his conditions.  (*Id.*).

Plaintiff is bothered by migraines probably once a month.  He describes that he deals with it by going into a dark room with no noise and putting a cold washcloth on his

forehead.  (*PageID#* 88).

Plaintiff testified that during a typical day he wakes up at about 5 a.m., takes a shower, and gets his kids off to school.  He described trouble sleeping through the night, and stated that he will try to help his wife by doing housework during the day while she is at work.  (*PageID#* 91).

Plaintiff testified that he does not do any yard work and that his son takes out the garbage.  (*PageID#* 93).  Plaintiff does not use a home computer or any gaming system. (*Id.*).  Plaintiff reported he "will walk down to the post office and get the mail.  It's about a block away, and [his wife] takes care of the bills."  (*Id.*).

Plaintiff testified that he does not go visit friends or relatives and that his only remaining hobby is playing his guitar (which he does once every couple of weeks). (*PageID#* 94).  Plaintiff does not smoke and only drinks alcohol occasionally.  (*Id.*)  He has had no problems with drugs or illegal substances.  (*PageID#* 95).

When questioned by his counsel, Plaintiff testified he would not go to the grocery store by himself – he only goes with his wife.  (*PageID#* 96-97).  Plaintiff testified that when he gets a migraine headache it will typically last the entire day and then the pain will continue for a couple days after that.  (*PageID#* 97).

When asked about his absences from work, Plaintiff testified that he worked at his last employer for about 9 months and was absent 6 times during that period.  (*PageID#* 98).

4

Plaintiff testified that he would probably avoid going to a social event like a friend's wedding.  (*PageID#* 100).  He indicated that he would not be able to play in a band like he used to because of his anxiety, and that he experienced decreased energy and feelings of guilt or worthlessness "all of the time."  (*PageID#* 102).  Plaintiff also testified to having thoughts of suicide 2 or 3 times a week.  (*PageID#* 103).

### B.      Vocational Expert Testimony

The Vocational Expert ("VE"), Suman Srinivasan, classified Plaintiff's past employment as a paperboard box maker, unskilled and performed at the heavy exertional level, and motor vehicle assembler, unskilled and medium exertion.  (*PageID#* 105).  The ALJ asked the VE to consider a hypothetical individual of Plaintiff's "age, educational background and work experience" with the following abilities and restrictions:

> work at the light level of exertion, lifting up to 20 pounds occasionally, lifting and carrying up to 10 pounds frequently, standing and walking for approximately six hours, and/or sitting for up to six hours in an eight hour work day, with normal breaks, allowing the person to alternate sitting or standing positions at 30 minute intervals throughout the day... Pushing and pulling would be limited to frequent on the left, ramps and stairs would be occasional.  There would be no climbing of ladders, ropes, or scaffolds, no stooping, kneeling, crouching, crawling.  Reaching would be frequent on the left, and overhead reaching would be limited to occasional on the left.... Will be avoiding concentrated exposure to irritants such as fumes, odors, dust, gases, and poorly ventilated areas.
>
> The work would be limited to simple, routine, and repetitive tasks in a work environment free of fast paced production requirements.  It would involve only simple work related decisions, with few if any workplace changes.  There would be no interaction with the public, and by no I mean any interaction would be limited to brief and superficial.  And again, there would be no interaction with co-workers and no tandem tasks.  Finally, the over-the-shoulder supervision would be limited to occasional.

(*PageID##* 106-07).  The VE responded that, with those limitations, such an individual

could not perform Plaintiff's past relevant work, but could perform approximately 5,000

jobs.  (*PageID#* 108).  She further testified that if the exertional level were reduced to

sedentary, with the other limitations remaining, there were 3,200 jobs the individual could

perform (such as general office clerk, office/messenger or a bookkeeping/auditing clerk).

(*PageID#* 109).  Finally, the VE testified that the hypothetical individual would not be

able to retain competitive work if he were to miss work more than a day and a half per

month.  (*Id.*).

When cross-examined by Plaintiff's counsel, counsel defined "moderate" mental

limitations as affecting performance "20% of the time."  This definition becomes a key

point in this case because the VE acknowledged that if Plaintiff was "moderately" limited

in his abilities to understand and remember detailed instructions; in the ability to maintain

attention and concentration for extended periods of time; and his ability to complete a

normal work day without interruptions from psychologically based symptoms, it would

eliminate the jobs she testified to above.  (*PageID##* 111-12).

## C. <u>Relevant Medical Opinions</u>[2]

### 1. H. Allen Ferguson Jr., D.O.

---

[2] In addition to mental impairments, the undersigned recognizes that Plaintiff alleges disability in part due to his physical impairments.  Plaintiff's Statement of Errors, however, focuses primarily on Plaintiff's mental impairments and limitations.  Accordingly, the Court will likewise focus its review of the medical evidence on Plaintiff's mental impairments and limitations.

On August 10, 2008, Dr. Ferguson, Plaintiff's primary care physician, reported that he had treated Plaintiff since September 4, 2007.  Dr. Ferguson prescribed Plaintiff psychotropic medication and noted on clinical examination that Plaintiff has anxiety manifested by his nervousness and irritability.  Plaintiff has a short concentration span, headaches, flat affect, and depressed mood.  Dr. Ferguson concluded that Plaintiff's response to therapy was good.  There were no issues of compliance that interfere with treatment and he stated, "[b]ased on my findings, I feel this patient is unable to work." (*PageID##* 441-42).

Dr. Ferguson's treatment notes dated from June 2009 through April 2010 show he diagnosed Plaintiff with a dysthymic disorder.  (*PageID##* 559-94).  In March 2010, psychiatric examination revealed Plaintiff had good judgment and normal mood and affect; was active and alert; oriented to time, place, and person; and his recent and remote memory was normal.  (*PageID#* 588).

 In August 2009, Dr. Ferguson completed a mental residual functional capacity assessment.  Dr. Ferguson noted that Plaintiff had anxiety.  Dr. Ferguson opined that Plaintiff had no limitation with the following abilities: remembering very short and simple instructions; sustaining an ordinary routine without special supervision; following work rules; working with others or in his ability to make simple work-related decisions; and working with the general public.  There was "some evidence of limitation" in his abilities to: understand, remember, and carry out detailed instructions; to carry out very short and simple instructions; to maintain attention and concentration for extended period;

7

and to interact with co-workers and supervisors.  Dr. Ferguson felt he had a moderate

limitation in his ability to deal with work stressors.  Dr. Ferguson also opined that

Plaintiff would miss two days of work per month.  (*PageID##* 546-49).

      **2.**      **Samaritan Behavioral Health**

      Plaintiff underwent an adult diagnostic assessment at Samaritan Behavioral Health

in October 2008.  (*PageID##* 447-56).  He was self-referred due to experiencing panic

attacks and depression.  (*PageID#* 453).  Plaintiff reported "activities that used to be fun

are no longer enjoyable, he used to enjoy playing the guitar and now seldom plays, he

finds it hard to get motivated, he thinks such thoughts as I might as well be dead, he

reports that he cries without cause, the depression started about 2005, he has some days

he reports not being depressed but they are very few.  He reports having his first panic

attack in 1998, he reports tenseness in his muscles, heaviness in his chest,

lightheadedness, sweaty hands, confusion." (*Id.*).  The intake counselor concluded that

Plaintiff's mental health problems are chronic and most likely will not get better without

treatment.  With treatment (counseling and medication), it was felt Plaintiff can

potentially do well.  It was noted that Plaintiff "has applied for social security and his

lawyer also suggested that it would be good for him to get a mental health assessment."

(*Id.*).  Plaintiff was diagnosed with a panic disorder without agoraphobia and major

depressive disorder, recurrent, moderate.  He was assigned a  Global Assessment of

Functioning ("GAF") score of 68.[3]  He only returned for two counseling sessions. (*PageID##* 457-60).

### 3.    Alan R. Boerger, Ph.D.

Dr. Boerger examined Plaintiff on behalf of the Ohio Bureau of Disability Determination ("BDD") on December 17, 2007.  (*PageID##* 362-67).  Plaintiff reported he began experiencing depression with anxiety and panic attacks in 1997 and has crying spells once or twice a month.  (*PageID#* 364).  Plaintiff also reported feelings of hopelessness about once or twice a month, and he had suicidal thoughts when he was trying to figure out what was wrong with him.

As to his daily activities, Plaintiff told Dr. Boerger that he was a "house husband." At the time of this evaluation, he got his children off to school and did laundry.  He cooked and straightened up the house.  He ran errands, played guitar, and took pictures. He had a couple of friends who stopped by to visit.  Plaintiff drove and went grocery shopping with his wife.  He also reported sometimes leaving family functions because of anxiety.  He was upset he could no longer play golf.  (*PageID##* 365-66).

---

[3] Global Assessment of Functioning is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34. A GAF score of 61-70 indicates that a person has only mild symptoms or some difficulty with social, occupational or school functioning, but such a person can generally functioning pretty well and have some meaningful interpersonal relationships.  DSM-IV-TR at 34.

Dr. Boerger noted that Plaintiff "feels uncomfortable but not fully anxious all the time. He said his comfort zone was in his house. He said sometimes it's just going to Wal-Mart or a sporting event that will stimulate a panic attack." (*PageID#* 364).

Dr. Boerger diagnosed Plaintiff with a panic disorder with agoraphobia and depressive disorder NOS. (*PageID#* 366). He assigned a GAF score of 51.[4] (*Id.*). Dr. Boerger opined that Plaintiff was capable of performing simple repetitive tasks without impairment. (*PageID#* 367). For occupational restrictions, Dr. Boerger felt that there would be mild limitations in Plaintiff's ability to understand and follow directions; and moderate limitations in Plaintiff's ability to relate to others, including fellow workers and supervisors, and his ability to withstand the stress and pressures associated with day-to-day work activity. (*PageID##* 366-67).

### 4. Leslie Rudy, Ph.D./Suzanne Castro, Psy.D.

State agency psychologist, Dr. Rudy, reviewed the record on January 4, 2008. (*PageID##* 369-86). Dr. Rudy determined that Plaintiff had moderate restrictions in activities of daily living and difficulty in maintaining social functioning, and difficulty in maintaining concentration, persistence or pace. (*PageID#* 379).

Dr. Rudy also completed a Mental Residual Functional Capacity Assessment where she found that Plaintiff had moderate limitations in: the ability to understand and remember detailed instructions; the ability to carry out detailed instruction; the ability to

---

[4]Individuals with GAF scores of 51-60 are classified as having "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to work in coordination or proximity to others without being distracted by them; the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in the work setting.  (*PageID##* 383-84).

Dr. Rudy concluded that Plaintiff retained the capacity to perform simple routine tasks in a setting without demands for fast paced or high production.  He can interact on a superficial level and adapt to routine changes.  (*PageID#* 385).  In July 2008, another state agency psychologist, Dr. Castro, reviewed the record and affirmed Dr. Rudy's opinion.  (*PageID#* 439).

## III.  ADMINISTRATIVE REVIEW

### A.  <u>"Disability" Defined</u>

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses only those who suffer from a medically determinable physical or mental impairment severe

11

enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

The term "disability" – as defined by the Social Security Act – carries a specialized meaning of limited scope. Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

### B. Social Security Regulations

Administrative regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See PageID##* 43-45; *see also* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review answers five questions:

1. Has the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

12

4.     Considering the claimant's residual functional capacity, can he perform his past relevant work?

5.     Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

C.     **ALJ Silvain's Decision**

ALJ Silvain's pertinent findings began at Step 2 of the sequential evaluation where he concluded that Plaintiff has the severe impairments of: 1) depressive disorder NOS; 2) panic disorder with agoraphobia; 3) asthma; 4) left wrist fracture status post open reduction internal fixation; 5) lumbar degenerative disc disease; and 6) migraines. (*PageID##* 45-51).  The ALJ determined that Plaintiff's hypertension and left shoulder pain are nonsevere.  (*PageID#* 51).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled one in the Listings.  (*PageID#* 51).

At Step 4, ALJ Silvain evaluated Plaintiff's residual functional capacity ("RFC"). The ALJ found:

> [Plaintiff] has the residual functional capacity to perform sedentary work.... except: 1) the opportunity to alternate sitting and standing positions at 30 minute intervals; 2) frequent pushing and pulling on the left; 3) no climbing of ladders, ropes, and scaffolds; 4) occasional climbing of ramps and stairs; 5) no stooping, kneeling, crouching, or crawling; 6) frequent reaching on the left; 7) occasional overhead reaching on the left; 8) avoid concentrated exposure to irritants such as fumes, odors, dust, gases, and poorly ventilated areas; 9) work that is limited to simple, routine, and repetitive tasks; in a

13

work environment free of fast paced production requirements; involving only simple, work-related decisions; with few if any work place changes; and 10) no interaction with the  public or co-workers (with any contact being brief and superficial in nature), with no tandem tasks, and only occasional "over-the-shoulder["] supervision.

(*PageID#* 53).

The ALJ concluded at Step 4 that Plaintiff was unable to perform any of his past relevant work.  (*PageID#* 57).

At Step 5, the ALJ used section 201.27 of the Grid,[5] coupled with the VE's testimony, and considering Plaintiff's age, education, work experience, and RFC, found there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (*PageID##* 57-58).

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB. (*PageID#* 58).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or

---

[5]*See* Medical-Vocational Guidelines, 20 C.F.R. Subpart P, Appendix 2.

disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    DISCUSSION

Plaintiff argues that the ALJ "erred when he adopted the medical opinions as written by the government reviewing physicians and then created hypotheticals which

excluded the specific limitations that he adopted."  (Doc. #8 at *PageID#* 626).

Specifically, Plaintiff contends the ALJ should have included the limitations set forth by

Drs. Boerger, Rudy, and Castro in the hypothetical question he presented to the VE.  (*Id.*).

Defendant argues the ALJ, in fact, "properly considered all these doctors' opinions in

determining Plaintiff's RFC and incorporated their limitations in the hypothetical

question he presented to the VE."  (Doc. #10 at *PageID#* 639).  Accordingly, Defendant

argues substantial evidence supports the ALJ's finding that Plaintiff can perform a

significant number of jobs in the national economy and was not disabled.  (*Id.* at *PageID#*

638).

At Step 4, the ALJ concluded Plaintiff is unable to perform his past relevant work,

"as the vocational expert testified [Plaintiff's past relevant work's] exertion level

requirements exceed those of the residual functional capacity set forth above."  (*PageID#*

57).  Thus, the analysis proceeded to Step 5, and the burden of proof shifted to the

Commissioner.  *See McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 836 (6th Cir.

2006).  At Step 5, "the Commissioner must make a finding 'supported by substantial

evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Ealy

v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) (citing *Varley v. Sec'y of Health

& Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)).  "Substantial evidence may be

produced through reliance on the testimony of a vocational expert (VE) in response to a

'hypothetical' question, but only 'if the question accurately portrays [the claimant's]

individual physical and mental impairments."  *Varley*, 820 F.2d at 779.

16

Plaintiff argues the hypothetical posed by the ALJ failed to include the limitations set forth by Drs. Boerger, Rudy, and Castro.  As such, Plaintiff ultimately contends that the vocational expert's testimony in response to such hypotheticals cannot serve as substantial evidence sufficient to support the ALJ's finding that Plaintiff has the vocational qualifications to perform specific jobs, as testified to by the VE.

Dr. Alan Boerger examined Plaintiff on December 17, 2007.  (*PageID#* 362).  In his summary of conclusions, Dr. Boerger stated the following regarding Plaintiff's condition:

1.    Mr. Shepard's ability to relate to others, including fellow workers and supervisors is moderately impaired as a result of anxiety and difficulty handling groups of people and reflected in difficulty tolerating being in a store.

2.    His ability to understand and follow instructions is mildly impaired and reflected in some forgetfulness in day-to-day activities.

3.    His ability to maintain attention to perform simple repetitive tasks is unimpaired.

4.    His ability to withstand the stress and pressures associated with day-to-day work activity is moderately impaired as a result of the combination of anxiety and depression.

(*PageID#* 366-67).

On January 4, 2008, Psychologist Leslie Rudy completed a Mental Residual Functional Capacity Assessment regarding Plaintiff.  In Section I, titled "Summary Conclusions," Dr. Rudy checked off boxes indicating Plaintiff was "Moderately Limited" in his ability to do the following:

17

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances
- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability respond appropriately to changes in the work setting

In Section III, titled "Functional Capacity Assessment," Dr. Rudy stated the following:

Clmnt is 39 y/o who alleges disability due to anxiety and physical conditions.

RC: Clmnt takes meds prescribed by her [sic] PCP.  Clmnt rcvd counseling in the past, but not currently.  He lives with his wife and children.  He takes care of his own personal needs w/o assistance.  He does some hhc such as laundry and cleaning.  He does some cooking and grocery shopping.  He reports having a difficult time being around a lot of people.

CE: Clmnt arrived on time for apt.  He was appropriately dressed and groomed. He reported a steady past hx of employment.  He reported that he got along well with past coworkers.  MSE: Clmnt was cooperative.  Affect was appropriate.  He was alert and oriented x3.  He recalled 4/4 objects after 5 minute delay.  He performed serial 7's w/o error.  He recalled 7 digits forward and 4 backwards. Diagnosis: panic disorder w/agoraphobia, depressive disorder, nos.

Clmnt retains the capacity to perform simple routine tasks in a setting without demands for fast pace or high production.  He can interact on a superficial level

and adapt to routine changes. Clmnt's statements are consistent with mer and considered to be credible. Weight is given to ce.

(*PageID#* 385). Dr. Rudy also completed a Psychiatric Review Technique on January 4, 2008, and noted, in part, that Plaintiff has moderate limitations in the following functional areas: restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (*PageID#* 379). On July 16, 2008, psychologist Dr. Suzanne Castro affirmed Dr. Rudy's assessment, as written. (*PageID#* 439). In his hypothetical, the ALJ set forth the following relevant restrictions:

> The work would be limited to simple, routine, and repetitive tasks in a work environment free of fast paced production requirements. It would involve only simple work related decisions, with few if any workplace changes.
> There would be no interaction with the public, and by no I mean any interaction would be limited to brief and superficial. And again, there would be no interaction with co-workers and no tandem tasks. Finally, the over-the-shoulder supervision would be limited to occasional.

(*PageID##* 106-07). Plaintiff argues the ALJ's hypothetical "only embraced a small portion of the specific limitations that he adopted." (*PageID#* 629).

It is clear the ALJ did not incorporate, verbatim, the mental limitations set forth by Drs. Boerger, Rudy, and Castro. However, an exact recitation of these Drs.' opinions was not required. As long as the hypothetical question accurately portrayed Plaintiff's impairments, the VE's testimony in response can provide substantial evidence sufficient to support the ALJ's finding that Plaintiff has the vocational qualifications to perform specific jobs. *See Varley*, 820 F.2d at 779.

Turning first to Dr. Boerger's opinion, the Court finds that the ALJ's hypothetical question accurately portrayed the mental limitations[6] he set forth. Dr. Boerger opined that Plaintiff was moderately impaired in his ability to relate to fellow workers and supervisors, and in his ability to withstand the stress and pressures associated with day-to-day work activity. Dr. Boerger found Plaintiff was unimpaired as it relates to his ability to maintain attention to perform simple repetitive tasks, and only mildly impaired in his ability to understand and follow instructions.

The ALJ's hypothetical limited the worker's interaction with the public, coworkers, and supervisors. Thus, Plaintiff's moderate impairment in his ability to relate to fellow workers and supervisors was accurately portrayed and accounted for by this portion of the ALJ's hypothetical. The ALJ's hypothetical also restricted the work performed to "simple, routine, and repetitive tasks in a work environment free of fast paced production requirements." The Court finds this restriction accurately portrayed Plaintiff's moderate impairment in his ability to withstand the stress and pressures associated with day-to-day work activity, as well as his mild impairment in his ability to understand and follow instructions, because it limited the work demands and requirements, and likewise, the stress and pressures associated with employment. Accordingly, the Court finds the ALJ's hypothetical accurately portrayed the mental limitations set forth by Dr. Boerger.

---

[6] Plaintiff does not challenge that the ALJ's hypothetical question accurately portrayed his physical impairments.

20

Turning to the opinions of Drs. Rudy and Castro, the Court also finds the ALJ's hypothetical accurately portrayed the mental limitations they set forth.  The ALJ considered Dr. Rudy's evaluation (later affirmed by Dr. Castro), although Plaintiff insists that this consideration was flawed because it did not take into account certain specific findings.  Plaintiff also argues that the ALJ improperly directed the vocational expert to Dr. Rudy's narrative assessment instead of recounting for the vocational expert the specific limitations found by the psychologist.

A Mental Residual Functional Capacity Assessment form such as that utilized by Dr. Rudy contains three sections.  Section I, titled "Summary Conclusions," consists of a list of twenty categories of mental abilities and provides five different check-off boxes reflecting possible degrees of limitation for each category.  The form expressly requires that a "[d]etailed explanation of the degree of limitation for each category . . . , as well as any other assessment information you deem appropriate, is to be recorded in Section III (Functional Capacity Assessment)."  (*PageID#* 383).  Dr. Rudy checked "not significantly limited" for eleven categories.  Dr. Rudy checked the box titled "moderately limited" in the following nine remaining categories: the ability to understand and remember detailed instructions; the ability to carry out detailed instruction; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to work in coordination or proximity to others without being distracted by them; the ability to complete a normal work day and work week without

21

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and he ability to respond appropriately to changes in the work setting.  (*PageID##* 383-84).  Dr. Rudy made no entry in Section II of the form, titled "Remarks." (*PageID#* 384).  Section III of the form, titled "Functional Capacity Assessment," is intended to provide a narrative explanation of the assessments reflected in the "Summary Conclusions" of Section I.  In her narrative summary, Dr. Rudy indicated that Plaintiff retains the capacity to perform simple routine tasks in a setting without demands for fast pace or high production; can interact on a superficial level; and can adapt to routine changes.  Dr. Rudy found that Plaintiff's statements are consistent with the medical evidence of record and considered to be credible.  (*PageID#* 385).  At the administrative hearing, the ALJ referred to this narrative statement in the hypothetical posed to the VE.

Relying on *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010), Plaintiff argues that the ALJ should have specifically recounted to the VE the nine categories in which Dr. Rudy found moderate limitation of functioning in Section I of the form.  *Ealy*, however, did not address the issue of whether an ALJ must include in the hypothetical not only the Section III Functional Capacity Assessment but also the categories of limitations in Section I of the form.  Other courts that have addressed this issue have concluded that Section I of the form is merely a worksheet for the evaluator and does not constitute the

evaluator's residual functional capacity assessment. *See Velez v. Comm'r of Soc. Sec.*, 2010 WL 1487599, *6 (N.D. Ohio Mar. 26, 2010) ("In general, . . . the ALJ is not required to include the findings in Section I in formulating residual functional capacity."); *Kachik v. Astrue*, 2010 WL 3852367, *6 (W.D. Pa. Sept. 27, 2010) (citing *Liggett v. Astrue*, 2009 WL 189934,*8 (E.D. Pa. 2009)); *Berry v. Astrue*, 2009 WL 50072, *15 (W.D. Va. Jan. 7, 2009); *Norris v. Astrue*, 2008 WL 4911794, *16 (E.D. N.C. Nov. 14, 2008); *Malueg v. Astrue*, 2007 WL 5480523, **6-7 (W.D. Wis. May 30, 2007). The form itself makes clear that it is the narrative reflected in Section III that embodies the actual assessment and this Court agrees with those other courts that have held that an ALJ is not required to expressly include Section I notations in formulating a claimant's residual functional capacity. The ALJ did not, therefore, err in referring the VE only to Dr. Rudy's narrative assessment of Plaintiff's mental residual functional capacity. Furthermore, as the mental limitations set forth in Drs. Rudy and Castro's narrative assessments were accurately portrayed in the hypothetical provided to the VE, the ALJ's reliance on such testimony regarding Plaintiff's vocational qualifications to perform specific jobs is supported by substantial evidence.

Plaintiff also appears to argue the ALJ erred based on his failure to address the testimony of the VE in relation to a hypothetical posed by his counsel. In this hypothetical, the VE was first instructed by Plaintiff's counsel to assume the definition of "moderate" means affecting a hypothetical individual's work "performance 20 percent of the time." (Doc. #5-2 at *PageID#* 111). The VE was then instructed by Plaintiff's

23

counsel, using the provided definition of "moderate," to consider whether jobs previously identified as available still existed for an individual who had a "moderate" limitation in the ability to understand and remember detailed instructions; a "moderate" limitation in the ability to maintain attention and concentration for extended periods of time; and "moderate" limitations in the ability to complete a normal work day without interruptions from psychologically based symptoms. In response, the VE testified the jobs she previously stated would be available would now be eliminated based on this hypothetical. (*PageID#* 112).

Plaintiff appears to believe the ALJ erred by not relying on this testimony, or at the very least, failing to discuss it in his decision. In essence, he argues that this statement by the VE represents conclusive evidence that no jobs are available for a hypothetical individual with such "moderate" limitations. Whether such testimony establishes the lack of jobs for an individual with such "moderate" limitations, however, is of little consequence to whether such testimony establishes that no jobs exist for a hypothetical individual with *Plaintiff's RFC*, because there is nothing to suggest that the definition of "moderate" Plaintiff arbitrarily created, and instructed the VE to adopt, accurately represents the term "moderate" as used in the opinions of Drs. Boerger, Rudy, and Castro, and incorporated into Plaintiff's RFC. The VE was not asked what she believed, in her expert opinion, the term "moderate" meant, rather, Plaintiff defined "moderate" for the VE, then instructed her to use his specific definition in a hypothetical, without any indication such a definition of "moderate" accurately portrays the term as incorporated

24

into Plaintiff's RFC.  The Court does not find the ALJ's failure to rely on such a hypothetical – particularly where Plaintiff's counsel created his own definition of key terms for the VE to use – was in error.  In addition, Plaintiff does not point to or rely on any particular rule or regulation requiring an ALJ to address every part of a VE's testimony that is not adopted in full.  Moreover, in a case such as this – where the portion of the VE's testimony *not* discussed by the ALJ relates to a hypothetical posed that does not accurately portray Plaintiff's RFC – Plaintiff has not shown that the ALJ erred.  *Cf. Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994) ("[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypothetical."); *cf. also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("For a response to a hypothetical to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant.").

Accordingly, Plaintiff's Statement of Errors (Doc. #8) lacks merit.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability determination be affirmed; and

2.      The case be terminated on the docket of this Court.


May 20, 2013

                                    s/Sharon L. Ovington
                                    Sharon L. Ovington
                            Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).